H. G

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel WILLIAM B. STALLINGS, | ) ) ) |
| | 3:13-cv-52-J-12JBt |
| Plaintiff, | ) ) |
| v. | ) ) |
| SEA STAR LINE, LLC, SALTCHUK RESOURCES, INC., LEONARD SHAPIRO, HORIZON LINES, LLC, and CROWLEY LINES SERVICES, INC., | ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT UNDER QUI TAM

This qui tam action is brought by the relator William B. Stallings pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, to recover damages, penalties, and the costs of suit, including reasonable attorneys' fees, for injuries to the United States Government resulting from Defendants' fraudulent course of conduct and conspiracy to allocate customers, rig bids, fix rates, surcharges and other fees for Puerto Rican Cabotage which resulted in the submission of false or fraudulent claims to the Government.

S-1

## Jurisdiction and Venue

1.      Jurisdiction of this Court and venue are based upon 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732 because one or more of the corporate defendants can be found and transacts business in the Middle District of Florida and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## Trade and Commerce

2.      The activities of defendants and their co-conspirators, as alleged herein, were within the flow of and substantially and adversely affected commerce among the several States and the Commonwealth of Puerto Rico.

## Background

3.      Waterborne Cabotage is merchandise shipping services between ports governed by the Merchant Marine Act of 1920, commonly referred to as the "Jones Act," which includes the transportation of merchandise between points in the United States, and most of its island territories and possessions, and associated commonwealths, including Puerto Rico.  *See* 46 U.S.C. § 55101, *et seq*.

2

4.      The Jones Act prohibits the "transportation of merchandise by water, or by land and water, between points in the United States . . . either directly or via a foreign port, unless the vessel is wholly owned by citizens of the United States for purposes of engaging in the coastwide trade." 46 U.S.C. § 55102(b). The Act, therefore, grants an exclusive privilege to certain United States owned and flagged vessels that are predominately crewed by American crews to engage in the coasting trade concerning the shipment of merchandise to or from U.S. territories, possessions or non-contiguous States.

### The Puerto Rican Cabotage Market

5.      The Jones Act limits competition in the coastwise market for shipping such that a few carriers dominate these trade lanes, which have historically been oligopolies.

6.      There are substantial barriers to the entry of carriers attempting to enter the Puerto Rico Cabotage market. Competition is limited by the Jones Act, substantial up front costs, a substantial lag time because of the need for U.S. built ships and adequate port facilities.

7.     Given the limited number of existing Jones Act qualified vessels, the high capital investment and long delivery lead times associated with building a new containership in the United States, the substantial investment required in infrastructure and the need to develop a broad base of customer relationships, the markets in which the Defendants operate have been less vulnerable to over capacity and volatility than international shipping markets.

8.     The high degree of concentration in the industry made it easier for the defendants to engage in anticompetitive conduct because they control the vast majority of the Jones Act shipping routes and in the Puerto Rico market Sea Star Line, LLC ("Sea Star"), Horizon Lines, LLC ("Horizon"), Crowley Lines Services, Inc. ("Crowley") together with Trailer Bridge, Inc. ("Trailer Bridge") account for nearly 100 percent of the market. The Defendants Sea Star and Horizon utilize container ships and the Defendant Crowley and Trailer Bridge offer shipping by barge.

9.     Waterborne Cabotage services are not readily replaced by other methods of transportation, the demand is inelastic, and waterborne shipping services are relatively fungible, such that purchasers decide and competitors compete largely based on price.

10. Price fixing and market allocation is especially deleterious in a highly concentrated, fungible market for which no adequate substitutes exist and with limited potential for new entrants into the market, such as the market for Waterborne Cabotage services on the Puerto Rico trade routes.

## The Plaintiff

11. The Relator William B. Stallings has standing to bring this action pursuant to 31 U.S.C. § 3730 because he was the "original source" who disclosed the information on which the claim is based to the Government before any public disclosure and has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and has voluntarily provided the information to the government before filing this qui tam action.

12. The United States Government, through its various departments and agencies, including but not limited to the United States Department of Defense and certain divisions including the Army Air Force Exchange Services, the Military Sealift Command Atlantic, the Military Traffic and Management Command, and the Surface Deployment and Distribution Command, United States Department of Agriculture and the United States Post Services, purchased Waterborne Cabotage services at all relevant

5

times directly from the Defendants Sea Star, Horizon and Crowley for the shipment of cargo between the United States and Puerto Rico, the purchase of which resulted in the submission to the Government of false or fraudulent claims in violation of 31 U.S.C. § 3729.

## The Defendants

13.     Defendant Sea Star is a Delaware corporation with its principal place of business in the Middle District of Florida.

14.     Defendant Saltchuk Resources, Inc. ("Saltchuk") is a Washington corporation with its principal place of business in Seattle, Washington.  Saltchuk is a privately held holding company with approximately sixteen predominately maritime businesses.  Saltchuk has a 90 percent equity interest in and controls Sea Star.

15.     Defendant Saltchuk participated in the conspiracy through its principals, officers, directors, and agents, actual and apparent, including, but not limited to, Leonard Shapiro, Robert P. Magee and Mark Tabbutt.

16.     Defendant Saltchuk used Sea Star for the wrongful purpose of engaging the conspiracy in that Saltchuk: (a) undercapitalized Sea Star; (b) exercised extensive

and pervasive control over Sea Star; (c) intermingled properties and accounts with Sea Star; (d) siphoned funds from Sea Star; and (e) disregarded the corporate form and separateness of Sea Star, in that Saltchuk officers and agents made major business decisions for Sea Star including, but not limited to pricing, vessel deployment, vessel sailings, slot charters with Horizon, capital expenditures, and personnel changes. As stated in the November 30, 2004 and May 15, 2007 video interviews of Saltchuk's founding partner and retired former Chairman Michael Garvey on Saltchuk's website, Saltchuk was directly involved in the selection of and compensation for Sea Star executives as well as budgeting for Sea Star, and in particular budgeting for Sea Star capital expenditures. Saltchuk also provided the funds for all significant Sea Star capital expenditures and directed and controlled strategic planning for Sea Star.

17.     The Defendant Leonard Shapiro ("Shapiro") was a founder, director and agent of Saltchuk whose business card identified him as a Principal and Director of Saltchuk with Saltchuk's address and phone numbers and e-mail address at leonard@saltchuk.com.

18.     Shapiro, acting on behalf of Saltchuk, conducted business at Sea Star's headquarters in Jacksonville from the time of Sea Star's formation in 1998 through at least 2003. Shapiro came to Sea Star on a regular basis, at least every 2-3 months for

7

several days at a time, and had dozens of meetings in Jacksonville with Sea Star's Vice President of Yield Management, Peter Baci (Baci), the primary focus of which was to direct Sea Star pricing, as well as Sea Star's processes and technology.

19.     The Defendant Horizon is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina, which markets and sells Waterborne Cabotage in the Middle District of Florida.

20.     The Defendant Crowley is a Delaware corporation with is principal place of business in the Middle District of Florida.

### The Conspirators

21.     Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## The Conspiracy

22.     Beginning in April 2002 and continuing until at least April 2008, the Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy to allocate customers, rig bids, and fix the prices of rates, surcharges and other fees for Puerto Rican Cabotage including bids, rates, surcharges, and fees for Puerto Rican Cabotage purchased by the United States Government.  As stated in a 2001 *Maritime Executive* interview, Crowley Maritime CEO Thomas B. Crowley, Jr., ("Crowley, Jr.") noted that a primary issue was that the Puerto Rico trade route was "overtonnaged" in 2001 and that the carriers' capacity exceed cargo volumes by "approximately 22-25%" creating "constant pressure on rates."

23.     As the largest and most aggressive carrier, Navieras/NPR ("Navieras") was primarily responsible for the high capacity and low rates on the Puerto Rico trade route and the genesis of Defendants' conspiracy was the bankruptcy of Navieras in April 2001.

24.     As a result of Navieras' exit from the market, the market for shipping services between the mainland United States and Puerto Rico became highly concentrated in that Sea Star purchased four of the Navieras ships which Navieras had

9

used to provide three weekly sailings between the United States mainland and Puerto Rico and in short order three were taken out of service and the fourth sold to Horizon which further increased the concentration of the market. Thus, the new market that emerged from Navieras's bankruptcy was highly conducive to an unlawful price-fixing conspiracy.

25.     Shapiro initially proposed the conspiracy to Gabriel Serra ("Serra"), a Senior Vice President and General Manager for Horizon, who was responsible for Horizon's pricing for the Puerto Rico Cabotage.

26.     Shapiro and Serra first reached an agreement at a meeting at the Park Hotel in Charlotte, North Carolina on April 24, 2002 to reduce the capacity of the Puerto Rico trade in that they agreed that certain Navieras sailings would be discontinued, agreed on a sailing schedule of their vessels from Jacksonville and that all shipping from Jacksonville to Puerto Rico on the Sea Star and Horizon vessels would be split 50/50 with the implicit understanding the Sea Star and Horizon would not compete with each other. Kevin Gill ("Gill") representing Horizon and Baci representing Sea Star, among others, attended the meeting. Gill retained a copy of his notes of the meeting.

10

27.     Before Sea Star bought the Navieras/NPR assets, both Horizon and Navieras sailed from Jacksonville on Tuesday and Friday and Sea Star sailed on Thursday and Saturday.  After the Park Hotel meeting, Sea Star and Horizon agreed that Horizon would continue to sail on Tuesday and Friday, that Sea Star would drop the overlapping Navieras sailings, and that Sea Star would sail on Thursday and Saturday.  As a result of the agreement, Sea Star scrapped the ships NPR had used to provide service from Philadelphia and the Sea Star "operations" from Port Elizabeth were on Horizon ships.  The result was an immediate and drastic reduction of roughly 25% in capacity on the Puerto Rico route.

28.     Following the meeting, Shapiro, who exercised direct control of Sea Star's employees with respect to pricing, met Baci in Jacksonville, told Baci that he had entered into an agreement with Serra to divide the Puerto Rico Cabotage freight volume with Horizon on a 50/50 basis and instructed Baci to work with Gill and later with Greg Glova ("Glova"), Gill's replacement, to implement the unlawful agreement. Baci has pled guilty to the conspiracy alleged herein and in his Sentencing Memorandum filed in the United States District Court for the Middle District of Florida he admitted that he was "aware of the entire conspiracy from its inception," that "although Leonard Shapiro was never an elected officer of Sea Star, because he was one

11

of the major shareholders of Saltchuk ... he was someone of massive authority who asserted himself into the operations of Sea Star" and it was Shapiro who "ordered [Baci] to collude with his counterpart at Horizon (Gill and, later, Glova) to participate in the antitrust conspiracy." *United States v. Peter Baci*, M.D. Fla. No. 08-cr-3500 (DK 36 - 8-9).

29.     Shapiro also asked William Stallings, the relator in this action, who was Sea Star's Vice President of Sales, to find "someone at Horizon to work with" on rates and asked Stallings on at least three separate visits to Sea Star's Jacksonville offices to find an executive at Horizon to partner with to discuss increasing rates. After being rebuffed each time, Shapiro finally said, "If you're too damn stupid to figure it out, I'll find someone else."

30.     Less than a month after the Park Hotel meeting, Baci and Gill met in Horizon's corporate apartment in Charlotte, North Carolina to discuss and agree on the details of the conspiracy to fix rates for classes of trade and customers, surcharges, customer allocation between Sea Star and Horizon, to continue to work together on key accounts as they came up for renewal, to coordinate contract and dates to control prices and to share the information necessary to do so.

12

31.    Shapiro and Serra met again in Dallas, Texas on June 26, 2003 at a Dallas-Fort Worth, Texas airport hotel to discuss Serra's complaints about Sea Star's conduct with respect to pricing at which meeting it was reaffirmed that Sea Star and Horizon would not compete on rates and services and, using the 50/50 Alaskan model, each would have a 50/50 share of the Puerto Rican Cabotage market for container ships.

32.    At the Charlotte, North Carolina, the Dallas, Texas meetings and at other times, Shapiro represented himself to be and it was understood by Serra and the others present at the meetings that Shapiro was an officer or agent of Saltchuk acting on behalf of both Saltchuk and Sea Star.

33.    In addition to Shapiro, other top officials of Saltchuk Mark Tabbutt ("Tabbutt"), President of Saltchuk and Robert P. Magee ("Magee") were directly involved in the discussions and decisions that would further the conspiracy.  Thus, in June 2005 Saltchuk and Sea Star began consideration of deploying a third vessel out of Jacksonville which would put at risk the profitability achieved by the conspiracy.  This resulted in many communications and meetings between Saltchuk, Sea Star and Horizon in the course of which Raymond told Magee that he was concerned that the good progress that had been made in the trade could be at risk going forward and

Magee responded by saying that "[What] we need to do is split the benefits as we go forward." In August 2005, Magee in an e-mail to Raymond, with a copy to Tabbutt, discussed the reasons why Sea Star needed a third ship and stated "I truly believe that we can manage the situation in a way that doesn't cause serious harm" and "we can be responsible and we are surely accountable," code words for adhering to the conspiracy. In further discussions, Raymond reminded Tabbutt and Magee that "over the period from May 2002 through today the Puerto Rican trade has stabilized and has been well served." Ultimately, Tabbutt and Magee came to Jacksonville in October 2005 to meet with Raymond and John Keenan at Ponte Vedra, Florida to try and work out the disagreement over the deployment of the third ship and its impact on the business of the two companies.

34.     On or about February 20, 2003, Tom Cowan, who had been retained by Horizon to facilitate communications with Sea Star and Saltchuk, met with Magee and either Shapiro or Tabbutt about the rates and pricing issues with respect to two large customers and Magee said he would "make sure those old practices (a reference to price competition by Navieras in the decade before May 2002) would stop."

35.     Baci also had numerous communications with Tom Farmer ("Farmer"), the Vice President of Crowley's Puerto Rico service responsible for pricing, and reached

14

agreements on general rate increases, including refrigerated containers, used cars, and other rates to specific customers and rigging bids, including purposefully higher bids. Crowley, because it used barges, generally charged lower rates and agreed with Sea Star and Horizon that it would try to maintain a spread of approximately $300 between the containership rates and barge rates. Baci and Farmer also reached agreements on increasing bunker fuel surcharges, port security surcharges and intermodal fuel surcharges.

36.     In January 2006, Baci met Gill and Gregory Glova at the Lodge Alley Inn in Charleston, South Carolina, the purpose of which was to introduce Glova, who was taking over Gill's position, to Baci. At this meeting, Baci, Gill, and Glova discussed surcharge amounts and the allocation of specific customers. After this meeting, Glova became Baci's primary conspiracy contact at Horizon.

37.     In January 2006, shortly after Glova took over Gill's role in the conspiracy for Horizon, traveled to Jacksonville to meet with Farmer, the purpose of which was to assure Farmer that Glova understood his role in the conspiracy and that the transition from Gill to Glova would be as "seamless" as possible.

15

38.    Horizon also coordinated rates with Crowley through communications between Charles Raymond ("Raymond"), Chairman and CEO of Horizon, and Crowley, Jr.  Raymond would call and/or meet with Crowley Jr. to bring to his attention instances where Crowley was not fully adhering to the price-fixing and customer allocation conspiracy so that Crowley Jr. would bring his executives back into line.  For example, in early May 2003, Raymond directed Gill to prepare a list of pricing actions taken by Crowley that Horizon perceived had cost Horizon business in the Puerto Rico trade lane for a meeting with Crowley, Jr. during the week of 5/5/03.

39.    On December 11, 2003, Raymond sent a handwritten note to Serra, Gill, and others within Horizon on his personal stationary as Chairman of Horizon that he "had a recent discussion with the Saltchuk folks, telling me Len Shapiro is moving from an employee of TOTE to the Board of Saltchuk."  Raymond stated that "I was reassured that this has no impact whatsoever on their Corporate pricing philosophy," telling Serra and Gill that the price collusion between Sea Star and Horizon on the Puerto Rico trade lane, previously coordinated by Shapiro for Saltchuk, would continue as before.  At the top of this note, Raymond wrote, "Please read and destroy."

40.    On an annual basis, Sea Star and Horizon would coordinate and agree on price increases for refrigerated containers resulting in annual increases of between $150

and $300 per container and from time to time Sea Star and Horizon would also reach agreement on increased rates of approximately 10% for dry cargo. These agreed upon price increases would be communicated to Crowley who would frequently follow suit.

41.     Defendant Sea Star and Horizon also agreed to and did allocate their key customers known as "Hall of Fame" accounts in that they would exchange the prices to be quoted to their key customers and the other party would agree to not compete for those accounts or to quote a higher, overbid or sham bid. On some occasions Sea Star and Horizon would exchange whole contracts or entire customer files so that each would know exactly what the other would bid and the terms of draft contracts.

42.     During the course of negotiating contracts with a customer, Sea Star and Horizon, and on occasion Crowley, would also exchange pricing information to verify what a customer was telling them about their competitor's rates.

43.     The Defendants and their co-conspirators also coordinated contract renewals of major customers, including the expiration dates of contracts so as to make it easier to coordinate the pricing on new contracts. Crowley, Sea Star and Horizon exchanged their contract logs with customer volumes and contract expiration dates that enabled the conspirators to coordinate bid rigging for contract renewals. Typically, the

conspirators allowed the established or largest volume carrier with a customer to be the "lead" or "driver" on rates with that customer and the secondary carriers would coordinate to overbid or not undercut the bid. Glova and his pricing managers frequently marked up lists of the top volume customers to note which carriers had the "lead." There were customers where Sea Star, Crowley, and Horizon all shared business and the conspirators agreed to maintain their respective volume shares. As a result, they had to closely coordinate their rate bids as to each point of cargo origin so that each of the three conspiring carriers maintained its share.

44.    Defendants and their co-conspirators also conducted their conspiracy through the extensive use of e-mail. Sea Star, Crowley, and Horizon used e-mail (and faxes) to exchange spreadsheets with customers' rates so that they could agree upon rates to be bid or used when renewing contracts with their customers.

45.    Baci recorded pricing agreements in numerous personal notebooks and annual Yield Plans, which set forth the increases for rates and surcharges and the schedule for such increases for various equipment and classes of trade for the upcoming year that Sea Star had agreed upon with Crowley and Horizon. For example:

(a)     Baci's Yield Plan for 2004 reflected the following items agreed upon by Sea Star with Horizon and Crowley in whole or in part: the carriers would (1) eliminate exceptions given to some customers to the bunker fuel surcharge; (2) increase the tier rates for FAK (freight all kind) customers by 10% by May 15; (3) increase used car rates by $100 by February 1; (4) increase refrigerated containers by $300 by September 1; (5) increase other contract rates by 10%; and (6) increase tariff rates by $200 per 40' container.

(b)     Baci's 2005 Yield Plan sets forth similar increases agreed upon among the carriers, in whole or in part, for that year: the carriers would (1) continued to eliminate BFS (bunker fuel surcharge) exceptions; (2) increase tank rates $275 on January 1; (3) increase used car rates $50 and other cars (SUVs) $100 by February 1; (4) increase the port security charge by $25 a container by April 1; (5) increase tier rates 5% for FAK and 7.5% for cargo NOS (not otherwise stated) by May 15; (6) increase reefer rates by $300 by September 15; (7) increase 40' dry units tariffs $150 by March 1; and (8) increase all other contract rates by 10%.

(c)     Baci's 2007 Yield Plan also reflects agreements with Crowley and Horizon, including agreements reached between Baci and Frank Peake (Peake), President of Sea Star, and Glova and Serra for Horizon at an October 24, 2006 meeting

19

at the Hyatt Regency hotel at the airport in Orlando, Florida, for increases in reefers ($150), FAK tiers ($110), intermodal rate structures ($110), and port security charges ($20). The participants of this Sea Star-Horizon meeting also discussed issues relating to the implementation of their 50/50 South Atlantic market share division agreement, including detailed review of market share and customer data, and enforcement issues relating to pricing to specific customers through review of "hit lists."

46.     Contracts for Puerto Rican cabotage for most customers are renewed annually. During the relevant time, most NVO (non-vessel operating common carrier) and FAK accounts were renewed in May, but the largest NVO/reefer accounts were renewed in September. Since at least 2003, for most NVO and FAK accounts, the tier rates per unit for each port were posted on the internet in April for the current and following year. Baci met with Gill or Glova in or before December every year to agree upon the increases of the NVO and FAK tier rates for the coming year. Baci then provided certain Sea Star employees with the agreed-upon rates for the upcoming year and instructed them to publish these rates on the internet. The NVO, FAK, and Cargo NOS tier rates increased by at least $100 per container every year through May 2008.

47.     The defendants and their co-conspirators monitored and enforced the conspiracy through review of the weekly volume data provided by PIERs, part of the

Journal of Commerce, that broke out unit volume by carrier and customer. The PIERs data did not at times come fast enough or accurately enough for the conspirators and as a result, Baci, Farmer, Gill and Glova regularly provided each other with their companies' volume data in real time. This data allowed the conspirators to determine if there had been any shifts in volume or market share that would indicate a conspirator might be engaging in some "cheating" or competition in violation of the conspiracy.

48.     Defendants and their co-conspirators also took measures to enforce the conspiracy. "Who Shot John" was code for one such effort to police the implementation of agreed-upon pricing. For example, Sea Star kept a running list of accounts where it lost volume, which it used for purposes of discussions with defendants and their co-conspirators to ensure that each defendant and their co-conspirators maintained its allocated customers and/or agreed-upon market share or volumes, despite occasional customer movement of volume from one company to another. For example, at one point, Sea Star's share of southeast container shipments dropped to 46% compared with 54% for Horizon. At the time, a large military contract was up for bid, and Baci asked Glova to allow Sea Star to win the award to bring the Sea Star-Horizon shares back to 50/50 balance.

49.     If pricing issues were not resolved by agreement between Baci, Gill/Glova, and/or Farmer, the issues would be bumped up the chain of command to be addressed and resolved by more senior executives such as Peake (Sea Star), Serra (Horizon), and Grune (Crowley).  On occasion, these pricing matters were elevated to the most senior levels of Sea Star/Saltchuk (Magee/Tabbutt), Crowley (Crowley Jr.) and Horizon (Raymond).

50.     In 2003, Defendants Horizon, Sea Star, and Crowley coordinated their bunker fuel surcharges at approximately $225 per container, even though fuel cost, as a percentage of operating cost per shipped unit, and fuel efficiency varied across these Defendants.  Despite defendants' differing cost structures, Horizon, Sea Star, and Crowley all provide similar services and their increased surcharges were not based on legitimate economic considerations.  In fact, the imposition of a bunker fuel surcharge per container or per vehicle bore virtually no relation to increases in the costs of fuel because any increase in the cost of fuel consumed is largely independent of the number of containers or vehicles transported.

51.     For example, in mid-March 2005, Horizon, Sea Star, and Crowley uniformly imposed bunker fuel surcharges of approximately $280 per container effective during the first week of April 2005.  In mid-April 2005, each again uniformly increased

22

the bunker fuel surcharge to approximately $310 per container.  At the end of June 2005, Horizon, Sea Star, and Crowley increased the bunker fuel surcharge to approximately $340 per container effective mid-July, and then increased the surcharge to approximately $375 per container, effective mid-September.  And, effective in mid-May 2007, Defendants Horizon, Sea Star, and Crowley uniformly increased bunker fuel surcharges by approximately $25 per container.

52.     Defendants and their co-conspirators in or around May 2004 also coordinated and discussed the adoption and implementation of an intermodal fuel surcharge (surcharges for fuel for truck transport of freight from the customers' inland points of origin to the ports).  Baci discussed the concept of breaking out and charging for intermodal fuel surcharges ("IFS") with Gill and Farmer before Sea Star moved forward.  All the carriers thereafter adopted the IFS by mid-2004.  Prior to this time, the only fuel surcharge imposed by the carriers had been for bunker fuel.

53.     Defendants and their co-conspirators discussed, coordinated and agreed upon the adoption and implementation of a port security surcharge and thereafter coordinated a number of increases in those surcharges.  Effective at the beginning of April 2003, Sea Star, Crowley, Horizon, and Trailer Bridge all for the first time imposed an identical $30 "Port Security Charge" per container.  This simultaneous

23

imposition of the identical security fee was not justified by the cost of security services and was the result of the conspiracy between the defendants and their co-conspirators. Thereafter, the defendants and their co-conspirators discussed and agreed up the amount and timing of subsequent increases in the "security charge" to $50 in April 2004, $75 in April 2005 and $95 in April 2007.

## The Criminal Convictions

54.    On October 1, 2008, Baci, Serra, Gill and Glova were charged by criminal information in the United States District Court for the Middle District of Florida, Jacksonville Division, with one count of conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of 15 U.S.C. § 1.  Each of the defendants pled guilty and was adjudicated of the charges in the Informations.

55.    On February 24, 2011, Horizon was charged by a criminal information in the United States District Court for the District of Puerto Rico with one count of conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican freight service in violation of 15 U.S. C. § 1.  Horizon pled and was adjudicated guilty of the charge in the Information.

24

56.     On November 17, 2011, Sea Star was charged by criminal information in the United States District Court for the District of Puerto Rico with one count of conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican freight services in violation of 15 U.S.C. § 1.  Sea Star pled and was adjudicated guilty of the charge in the Information.

57.     On July 31, 2012, Crowley was charged by criminal information in the United States District Court for the District of Puerto Rico with one count of conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican freight services in violation of 15 U.S.C. § 1.  Crowley pled and was adjudicated guilty of the charge in the Information.

## Fraudulent Concealment

58.     The purchasers of Puerto Rican Cabotage services had no knowledge of defendants' unlawful conspiracy and could not have discovered the contract, combination or conspiracy until 2008 by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by defendants to avoid detection of, and fraudulently conceal their contract, combination or conspiracy.

59.     For example, defendants concealed their conspiratorial communications by opening e-mail accounts under pseudonyms used to disguise their true identities. For example, Gill an later Glova shared pricing information using e-mail accounts created under the names southorange@gmail.com, annclark@gmail.com, and gglova@yahoo.com while Baci shared similar information under the name lighthouse@gmail.com. Defendants used these e-mail accounts to communicate pricing information and to fix the bids for Puerto Rican Cabotage services to numerous customers.

60.     As a result of the fraudulent concealment of the conspiracy, plaintiff asserts the tolling of the applicable statute of limitations affecting the right of action by the United States government.

## Damages

61.     As a direct and proximate result of Defendants' scheme, the United States government has been injured and financially damaged in amounts which are presently undetermined.  The government's injuries consist of paying higher prices to purchase Waterborne Cabotage than it would have paid absent Defendants' conduct.

26

62.    William B. Stallings has engaged the undersigned counsel to represent him in this action and has agreed to pay counsel a reasonable attorneys' fees which he is entitled to recover pursuant to 31 U.S.C. § 3730(d).

WHEREFORE, William B. Stallings, on behalf of the United States government, demands that judgment be entered against defendants for three times the amount of damages sustained by the government, plus civil penalties and the costs of this action, including a reasonable attorneys' fee.

That plaintiff have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: January 15, 2013 .

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By _____
Charles P. Pillans, III
Florida Bar No. 0100066
Primary:      cpp@bedellfirm.com
Secondary:   skg@bedellfirm.com
John G. Woodlee
Florida Bar No. 0100990
Primary:      jgw@bedellfirm.com
Secondary:   ghw@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone:   (904) 353-0211
Facsimile:    (904) 353-9307

Attorneys for Relator William B. Stallings